Alice MULHERIN et al.,
Plaintiffs-Appellants,

v.

John L. O'BRIEN, Jr.,
Defendant-Appellee.

No. 78–1187.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1978.
Decided Dec. 29, 1978.

James T. Ronan, Salem, Mass., with whom Henry C. Porter, Ronan & Harrington, and Jerome F. Twomey, Salem, Mass., were on brief, for appellants.

Robert B. Stimpson, Lynn, Mass., with whom Jaffee & Stimpson, Lynn, Mass., was on brief, for appellee.

Before KUNZIG, Judge, Court of Claims,* BOWNES, Circuit Judge, and DUMBAULD, District Judge.**

DUMBAULD, District Judge.

Plaintiffs-appellants were employed in the office of the Register of Deeds for Essex County, Massachusetts. Defendant-appellee became Register of Deeds on or about January 3, 1977, and a month later each of plaintiffs received a letter stating "Due to unsatisfactory job performance, your employment at the Salem Registry of Deeds is terminated herewith." They brought suit (presumably under 42 U.S.C. § 1983, though the Complaint states no jurisdictional basis but in the prayer for relief does seek a declaration that their dismissal violated the First Amendment). Reinstatement as well as damages for "loss of wages, mental and emotional suffering and loss of prestige and standing in the employment market, resulting from their illegal dismissal by the defendant" was sought. Upon motion by defendant, the complaint was dismissed by Judge W. Arthur Garrity, Jr., on March 20, 1978. It will be helpful to consider the allegations of the Complaint in the light of established doctrines of constitutional law.

That the federal and State governments should operate independently within separate spheres of action (although both impinge directly upon the same individuals or citizens) has long been a basic feature of the unique federalism which has been a distinctive characteristic of the traditional structure of American government.[1] In the words of an astute British observer: "All Americans have long been agreed that the only possible form of government for their country is a Federal one."[2] There were no other workable options open to the framers of the Constitution of the United States.

The possible alternatives confronting the Founding Fathers are lucidly set forth in James Wilson's classical exposition in the Pennsylvania ratifying convention:

America . . . may . . . become one consolidated empire; she may be divided into thirteen separate, independent, and unconnected commonwealths; she may be erected into two or more confederacies; or lastly, she may become one comprehensive federal republic.[3]

Of these possibilities the first, complete consolidation into a single unitary government, was generally considered as being, in Madison's language, "as inexpedient as it is unattainable."[4]

The unsatisfactory consequences of separate co-existence had been brought home by experience under the Articles of Confedera-

* Sitting by designation.

** Of the Western District of Pennsylvania, sitting by designation.

1. Edward Dumbauld, *The Constitution of the United States,* 112–13, 127 (1964).

2. James Bryce, *The American Commonwealth,* I, 341 (3rd ed. 1914, reprinted 1921). For Bryce's comments on the shortcomings and merits of federalism, see *ibid.,* 340–58.

3. Speech of November 24, 1787. *Documentary History of the Ratification of the Constitution* (Edited by Merrill Jensen), II, 345 (1976). For another version of this passage, see *ibid.,* 357.

4. James Madison to George Washington, April 16, 1787. *The Writings of James Madison,* II, 344 (Gaillard Hunt, ed., 1901). The prevalence of Montesquieu's notion that a vast territory could only be governed by a despotism rendered this alternative unacceptable to Americans. Wilson, note 3, *supra,* 341. For Jefferson's criticism of Montesquieu's view, see Gilbert Chinard, *The Commonplace Book of Thomas Jefferson,* 34 (1926). See also Jefferson to Isaac T. Tiffany, August 26, 1816, *The Writings of Thomas Jefferson,* XV, 65–66 (Lipscomb and Bergh, eds., 1904).

tion.[5] Similar evils could be anticipated if a group of loose confederacies were created. Only the establishment of a "comprehensive federal republic" presented a hopeful prospect of rendering "the federal constitution adequate to the exigencies of Government & the preservation of the Union."[6]

The governmental mechanism embodied in the United States constitution was unique and *sui generis*, as Madison, the "Father of the Constitution," recognized. "In order to understand the true character of the Constitution of the U.S. the error, not uncommon, must be avoided, of viewing it through the medium either of a consolidated Government or of a confederated Govt. whilst it is neither the one nor the other, but a mixture of both. And having in no model the similitudes & analogies applicable to other systems of Govt. it must more than any other be its own interpreter, according to its text & the facts of the case."[7] The Constitution contemplated that "sovereignty . . . was in its nature divisible, and was in fact divided" in the "mixt Govt." created by that document.[8]

That governmental powers are divisible and limitable constitutes a fundamental principle of American polity. The principle appears in three aspects: (1) as the essence of constitutional government itself;[9] (2) as the basis of the traditional doctrine of separation of powers, derived by the framers from Montesquieu;[10] (3) as the foundation of federalism, where separate spheres of action are assigned to central and local agencies of government.[11]

Since the essential feature of federalism is thus the attribution to the central and local authorities respectively of separate and limited spheres of action, it is vital to the successful functioning of a federal system that the boundaries between such spheres be known and respected.

In "Our Federalism"[12] it has long been recognized that a State may mold its governmental system in such form as it sees fit. It may have a unicameral or bicameral legislature. Its chief executive may or may not be permitted to succeed himself after serving one or more terms. It may or may not establish judicial tribunals of a particular character, such as separate courts of equity[13] or intermediate courts of appeal.

More specifically it may or may not adopt a civil service system for State and

5. On the defects of the Articles of Confederation see Dumbauld, *The Constitution of the United States*, 32–37, 110–11 (1964).

6. Resolution of the old Congress of February 4, 1787, calling the constitutional convention to meet at Philadelphia. Charles C. Tansill (ed.), *Documents Illustrative of the Formation of the Union of the American States*, 23 (1927). In the terminology of German jurists, the Constitution established a *Bundesstaat;* the Confederation, expressly described in the Articles as a "league," was a *Staatenbund.*

7. Madison to Edward Everett, August 28, 1830. *The Writings of James Madison*, IX, 384–85 (Gaillard Hunt, ed., 1910).

8. *Ibid.*, 568–69.

9. Constitutional government is essentially limited government. Charles H. McIlwain, *Constitutionalism and the Changing World*, 248 (1939). It is in this connection that Chief Justice John Marshall, in *Marbury v. Madison*, 1 Cr. 137, 177 (1803), declared that if an ordinary act of legislation may alter the constitution "then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable." So too Jefferson regarded the British constitution, which can be changed by any act passed by Parliament, as "no constitution at all." Dumbauld, *The Constitution of the United States*, 18–19 (1964).

10. Dumbauld, *The Constitution of the United States*, 320 (1964).

11. In *Nixon v. Administrator of General Services*, 433 U.S. 425, 507 (1977), separation of powers and federalism were viewed as twin pillars of the American constitutional system.

12. To employ Justice Black's heartfelt phrase in *Younger v. Harris*, 401 U.S. 37, 44–45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

13. *Anglo-American Provision Co. v. Davis Provision Co.*, 191 U.S. 373, 374, 24 S.Ct. 93, 48 L.Ed. 228 (1903) [Holmes, J.], and other cases cited in Dumbauld, *The Constitution of the United States* (1964) 390. See also *Missouri v. Lewis*, 101 U.S. 22, 30–31 (1897); and *Tumey v. Ohio*, 273 U.S. 510, 534, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

local employees, whether patterned upon the classical federal civil service system, or the modified system recently enacted [14] under the sponsorship of President Jimmy Carter designed to effect speedier and easier separation from the federal service of unsatisfactory employees, or upon any other model. State legislatures, not federal courts, should decide what, if any, civil service protection or tenure rights should be accorded to particular classes of State and local employees in order to promote the public interest.

It has even been held by the Supreme Court of the United States in a leading case that a State's right to pay its employees substandard wages must be respected. *National League of Cities v. Usery,* 426 U.S. 833, 845, 857, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). This case recognizes in striking fashion the inviolable integrity of a State's right to fashion in accordance with its own discretion and determination the structure of its machinery for performing essential and intrinsically governmental functions. The matter of regulating the type of political structure desired by the people of a State is wholly confided by "Our Federalism" to the discretion of that State.

█ The only legitimate occasion for interference by a federal court with the functioning of State government is to protect and enforce rights guaranteed by the federal Constitution or laws.

Various illustrations of the protection of such rights may be noted. Perhaps one of the earliest to be recognized was the right of access to federal courts. To ensure such access the Supreme Court held that States could not prevent corporations from invoking the jurisdiction of federal courts in appropriate cases or penalize them for doing so by withdrawing the corporations' right to do business within the State, even though the terms upon which foreign corporations are permitted to do such business is a matter normally confided to the State's unfettered discretion. *Harrison v. St. L. & San Francisco R.R. Co.,* 232 U.S. 318, 329, 34 S.Ct. 333, 58 L.Ed. 621 (1914).

Another example where penalizing the exercise of a constitutional right is forbidden is the practice of requiring that criminal sentences not be increased because a defendant exercises his right to stand trial rather than plead guilty, or exercises his right to appeal. *North Carolina v. Pearce,* 395 U.S. 711, 724, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

So too it was held in *Simmons v. U. S.,* 390 U.S. 377, 390, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), that a defendant's testimony (admitting ownership of seized property) given in order to establish standing at a hearing in support of a Fourth Amendment claim to suppress evidence can not be admitted against him at trial upon the issue of guilt or innocence. For to hold that he had waived his Fifth Amendment right against self-incrimination by testifying at the suppression hearing would be to penalize him for asserting his Fourth Amendment claim.

Another illustration showing that exercise of a constitutional right must not be penalized is found in *Pickering v. Board of Education,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968). There a school teacher had been dismissed for publishing in a newspaper a letter criticizing the school board for spending too much money for athletic fields instead of teachers' salaries. The Supreme Court held that the teacher's First Amendment rights to freedom of speech were violated; that "the threat of dismissal from public employment is . . . a potent means of inhibiting speech" and that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." To the same effect see *Perry v. Sinderman,* 408 U.S. 593, 598, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

What was said in *Pickering* was reaffirmed and applied to a different type of public employment in *Elrod v. Burns,* 427 U.S. 347, 358, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), upon which plaintiffs-appellants in the case at bar rely.

14. Act of October 13, 1978, 92 Stat. 1111, 95th Congress, Public Law 95–454.

In harmony with the foregoing discussion, we interpret *Elrod* as an additional exemplification of the general principle that exercise of federally guaranteed rights, especially freedom of speech, must not be penalized. Such an interpretation is in line with previous precedents and could command general acceptance. The broad and sweeping construction which appellants would have us adopt, although perhaps it may find some support in the sociological discourse contained in Mr. Justice Brennan's "wide-ranging opinion" (427 U.S. at 374, 96 S.Ct. 2673) which was accepted by only two other Justices, would be an innovative elaboration not in harmony with established principles.[15] It would likewise increase the volume of litigation under which the courts already labor by inviting judicial scrutiny of every dismissal from public employment and contribute to the "overjudicialization"[16] of life which currently plagues the nation. It would also represent an unjustifiable intrusion into matters falling within the sphere of State regulation. And as indicated earlier, it is a basic feature of "Our Federalism" that interference by the federal judiciary with a State's freedom to fashion the structure and control the operation of its own governmental machinery must be limited to cases genuinely involving enforcement of a specific right under federal law.

But appellants in their complaint in the case at bar do not allege that they are being penalized for the exercise of their federally recognized constitutional right of free speech. In their brief they concede that "nowhere in their Complaint is it specifically alleged that they were fired 'because of their political affiliations',," or as the consequence of any other form of exercising First Amendment rights. They did not, like the school teacher in *Pickering* or the welfare worker who criticized irregularities in administration of the food stamp program in *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 117 (1st Cir. 1977), "comment upon matters of public concern related to [their] employment," or upon any other matters of public concern.

In view of this conclusion, it is not necessary to consider the procedural questions of local law raised by defendant-appellee, who contends that under Massachusetts law in an action to recover salaries for the posts held by appellants the County Treasurer is a necessary party, as well as the County of Essex, and that the County is a subdivision of the Commonwealth. Hence it is argued, the action can not be maintained under the Eleventh Amendment against the Commonwealth or under 42 U.S.C. § 1983 against the county [citing *Aldinger v. Howard,* 427 U.S. 1, 16, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)]. We do not pass upon the soundness of these contentions.

The District Court's order of dismissal is

Affirmed.

BOWNES, Circuit Judge (dissenting).

I dissent. While I do not quarrel with my learned brother's historical exegesis of federalism, his opinion sweeps with too broad a brush.

The complaint was dismissed for failure to state a cause of action. While the complaint is inartfully drawn and does not allege clearly what constitutional rights are implicated, we are bound to construe it, as was the district court, so as to do substantial justice. Fed.R.Civ.P. 8(f). The complaint alleges: that plaintiffs-appellants were nonpolicy making employees in the Registry of Deeds for the County of Essex, Massachusetts; that they were fired shortly

---

**15.** Likewise pertinent to the case at bar is the comment of Mr. Justice Stevens in *Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976), that "unless we were to adopt MR. JUSTICE BRENNAN'S remarkably . . . far-reaching view that almost every discharge implicates a constitutionally protected liberty interest, the ultimate control of state personnel relationships is, and will remain, with the States; they may grant or withhold tenure at their unfettered discretion."

**16.** This appropriate term, so far as we are aware, was first employed by Judge Harold Leventhal in his article "Environmental Decisionmaking and the Role of the Courts," 122 U. of Pa.L.R. (January, 1974) 509, 542.

after defendant-appellee took office as the newly elected Register of Deeds; that their proposed replacements were close political supporters of the appellee; that appellants did not actively support appellee; and that the reason given for the firing, *i. e.,* unsatisfactory job performance, was groundless.

These allegations would seem to be encompassed in the question presented in *Elrod* as framed by Mr. Justice Brennan.

This case presents the question whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or *nonaffiliation* state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments (emphasis added).

*Elrod v. Burns,* 427 U.S. 347, 349, 96 S.Ct. 2673, 2678, 49 L.Ed.2d 547 (1976). There can be little doubt that, if appellants had campaigned actively for appellee's opponent instead of remaining politically neutral, *Elrod* would apply and appellants' jobs would be protected. Perhaps time will show that *Elrod* should be confined to its facts, but it is difficult now to trace its exact contours and implications. *See Patronage and the First Amendment After Elrod v. Burns,* 78 Colum.L.Rev. 468 (1978). As Mr. Justice Stewart noted in his separate concurrence, "This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations." *Id.* at 374, 96 S.Ct. at 2690.

I am unwilling to hold that *Elrod* and "the established principles of federalism" require a dismissal of the complaint for failure to state a cause of action. It may be, after the facts have been established, that a ruling should issue that *Elrod* does not apply, but a decision involving constitutional rights should not be made in a vacuum. I would reverse and remand for a hearing so that the facts could be fully developed.