Josie Mae **ELKINS**, Administratrix of the Estate of Ray Elkins, Deceased,

and

**John A. Williams**, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

**Civ. A. No. 66–C–76–R.**

United States District Court
W. D. Virginia,
Roanoke Division.

Sept. 11, 1969.

Granville R. Patrick, Allen, Allen, Allen & Allen, Richmond, Va., for plaintiffs.

Thomas B. Mason, U. S. Atty., Roanoke, Va., for defendant.

## OPINION and JUDGMENT

DALTON, Chief Judge.

Plaintiffs have filed this action against the United States of America pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) in an attempt to recover damages for injuries resulting from the alleged negligence of United States' agents or employees who were acting within the scope of their employment.

On September 17, 1964, John A. Williams, plaintiff, was injured and Ray Elkins, the other plaintiff's decedent, was killed in an accident caused by the explosion of a high pressure airplane tire, 56 inches in diameter and 16 inches in width, which allegedly had been sold as surplus rubber by the defendant's agents. Plaintiffs allege that the high pressure airplane tire was an inherently dangerous instrumentality and that the United States' employees were negligent when they sold such a high pressure tire

to the general public without any restrictions, warnings or instructions for proper dismantling procedures.

The issue before the court is whether the defendant is liable in damages for the death of Ray Elkins or for the injuries of John A. Williams, both of which resulted from the explosion of the high pressure airplane tire.

On December 17, 1968, the court, sitting without a jury pursuant to 28 U.S. C. § 2402, heard evidence on the merits of this case. At that time counsel for both parties stipulated that all discovery depositions previously taken of the witnesses would be admitted as part of the record and considered by the court as evidence.

FINDINGS OF FACT

On the basis of the evidence heard *ore tenus* by the court, the pleadings, depositions and exhibits introduced as evidence and the arguments of counsel, the court in accordance with Fed.R.Civ.P. 52 makes the following findings of fact:

1. During the summer of 1964 Jack R. Ferguson operated a small scrap rubber business at 3058 Salem Turnpike, Roanoke, Virginia.

2. In order to supply his business inventory of scrap tires and rubber, Mr. Ferguson purchased a quantity of surplus tires from the surplus yard at Norfolk Naval Shipyard, Portsmouth, Virginia, in the summer of 1964. The purchase included approximately 35 to 40 tires of varying sizes, and Mr. Ferguson was given no choice as to individual tires. He could purchase the entire lot or none at all.

3. The Norfolk Naval Shipyard used 32 ply 56″ x 16″ tires on its premises for dead loads, which are used to simulate aircraft in testing catapults on aircraft carriers. These tires are otherwise used on aircraft owned or used by the United States Government such as B–50 bombers, KC–97 tankers and possibly B–52 bombers, B–36 bombers, and B–47 medium bombers. There has been no evidence presented to indicate that such tires are used by any civilian owned aircraft.

4. The 56″ x 16″ tires used on the dead loads at the Norfolk Naval Shipyard were disposed of through its salvage yard after such tires had become worn and unserviceable.

5. The Norfolk Naval Shipyard is an agency of the United States of America and its personnel are the employees of the United States of America.

6. The United States of America sold the quantity of tires to Jack R. Ferguson without any warning of possible danger or instructions as to proper or safe methods of dismantling the tires.

7. After purchasing the surplus tires in 1964 Ferguson employed Ray Elkins in September 1964 to dismantle the tires from their rims. Mr. Elkins had prior and lengthy experience in dismantling tires from their rims, and Mr. Elkins hired John W. Williams to assist him in dismantling the tires although Mr. Williams had little prior experience in dismantling tires.

8. Mr. Williams and Mr. Elkins, working together, dismantled over twenty-five tires of varying sizes including at least one or two extremely large high pressure tires approximately 56″ in diameter, similar to the one which exploded.

9. Mr. Williams and Mr. Elkins both realized that it was dangerous to attempt to dismantle a tire from its rim without deflating the tire; therefore, they extracted the valve cores out of the tires in an attempt to deflate the tires before dismantling them.

10. Mr. Williams and Mr. Elkins placed one of the 56″ x 16″ tires over to the side without attempting to dismantle it because they were not certain that the tire was deflated.

11. Mr. Williams attempted to deflate the 56″ x 16″ tire, which later exploded, by extracting what he assumed to be the valve core. The piece extracted by Mr. Williams was not in fact the core of the valve, but was really the core

of the valve extension, a mechanism attached to the valve to extend through the tire rim so as to facilitate inflation of the tire. The valve was so short on the 56″ by 16″ tire that it did not extend through the rim, and inflation of the tire was virtually impossible without attaching the mechanism known as a valve extension onto the valve. The valve extension core extracted by Mr. Williams was approximately four or five inches long; the valve core itself is much shorter.

12. Mr. Williams heard no air escape when he extracted the valve extension core. He then asked Mr. Elkins: "Do you think it's all right to work on it [the tire]?" Thereafter, Mr. Elkins and Mr. Williams proceeded to dismantle the tire without taking any further action or precautions to prove that the tire was deflated.

13. The tire was mounted on a rim, weighing approximately 380 pounds, which was constructed in two halves and bolted together with approximately twelve bolts. After Mr. Williams and Mr. Elkins had extracted three or four bolts, the tire exploded, killing Mr. Elkins immediately and seriously injuring Mr. Williams.

14. Written on the tire were the markings: GFM TEM PUSE 25965, which markings were placed there by employees of the defendant as abbreviations. GFM is an abbreviation for Government Furnished Material.

15. The tire was 56″ high, 16″ wide, 32 ply, and weighed approximately 281 pounds. The tire is designed to support 60,000 pounds; is normally inflated to 250 psi; and has a bursting pressure of approximately 875 psi. The 12 bolts which hold the split rim together are designed to withstand a force in excess of 250,000 pounds and the force of the explosion of the tire would be in excess of 100,000 pounds if the tire were inflated to its normal pressure of 250 psi.

16. On the basis of the evidence presented, the court finds as fact that the high pressure airplane tire which exploded was purchased by Jack R. Ferguson as surplus rubber from an agent of the defendant.

17. The explosion of the tire resulted from the failure of Mr. Williams and Mr. Elkins to deflate the tire prior to their attempt to dismantle it.

## CONCLUSION

■ The defendant, the United States of America, is liable to the plaintiffs for their damages if under the same circumstances a private person would be liable. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Smith v. United States, 155 F.Supp. 605 (E.D.Va.1957); 28 U.S.C. § 1346(b).

■ The court must determine whether either the defendant or its agents were negligent so as to proximately cause plaintiff's injuries and whether the plaintiffs were contributorily negligent. Of course the burden is on the plaintiffs to prove that the defendant or its agents were negligent and the burden is likewise on the defendant to prove contributory negligence on the part of the plaintiffs.

■ The general principle of law applicable to the facts of this case is that one who supplies a chattel for another to use is subject to liability for bodily harm caused by his failure to relate information as to the character and condition of the chattel which he should recognize as necessary to enable the prospective user to realize the danger of using it. Roberts v. United States, 316 F. 2d 489 (3rd Cir. 1963); see Annot. 86 A.L.R. 947 (1933); Restatement of Torts, (1934 Ed. p. 1040). If the chattel is inherently dangerous and its danger is not obvious from its appearance, the seller has an obligation to anticipate reasonably foreseeable risks and warn of them. Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (4th Cir. 1962); McClanahan v. California Spray Chemical Corp., 194 Va. 842, 75 S.E.2d 712 (1953.)

The defendant says it was not negligent, contending that the 56″ x 16″ tire

was not inherently dangerous so long as simple and reasonable precautions were employed in its use and dismantlement. The defendant argues that it could not reasonably foresee that a person would attempt to dismantle a tire before deflating it; such a procedure being obviously dangerous to any reasonably prudent man. The defendant's brief cites the recent case of Allison v. United States, 264 F.Supp. 1021 (E.D.Ill.1967) to support its argument that the defendant was under no duty to warn persons handling high pressure scrap tires of obvious dangers involved in dismantling such tires or of standard safe practice used to dismantle such tires.

The facts in Allison v. United States, *supra*, were that the plaintiff's employer purchased certain hydraulic shock absorbers from the defendant, the United States of America. While in the process of cutting one of the hydraulic shock absorbers with an acetylene torch, the plaintiff was injured when the hydraulic shock absorber exploded. The court found that the explosion occurred because the plaintiff had not vented the shock absorber. Assuming the shock absorber to have already been vented, the plaintiff failed to check to make sure such action had been taken. The record contained expert testimony that the standard safe practice among welders is to make sure that any sealed container has an air hole in it before applying to it an acetylene or other cutting torch. The court found that the defendant, the United States, as a seller of scrap, is not bound to anticipate or reasonably foresee a danger occasioned by an extraordinary use of the article or the misuse of such article by a careless or incompetent person. In the case at the bar the plaintiffs were not involved in an extraordinary use or misuse of the tire; they were dismantling the tire from the rim, a use which is definitely foreseeable.

The test in Virginia to determine if a product is inherently dangerous is whether "the danger of injury stems from the product itself, and not from any defect in it." Spruill v. Boyle-Mid-

way, Inc., 308 F.2d 79 at 83 (4th Cir. 1962) as quoted from General Bronze Corp. v. Kostopulos, 203 Va. 66 at 70, 122 S.E.2d 548 at 551 (1961).

The 56″ x 16″ tire which exploded is designed for great air pressure. When inflated to its standard pressure of 250 psi, a stress of greater than 100,000 pounds is exerted against the bolts which hold the split rim together. However, it is possible to unscrew the bolts without deflating the tire, a procedure which is highly dangerous and almost certain to result in serious harm. It is difficult to determine if such a tire is deflated. Mr. George Hunt, a mechanical engineer for twenty-five years, as an expert witness for the plaintiff, testified that he is familiar with such high pressure tires and has had experience in deflating and dismantling the tire, but, nevertheless, always drills a hole through the casing to make sure the tire is deflated before attempting to dismantle it. He further testified that a person must be very experienced to determine if such a tire is deflated by hitting it with a heavy hammer or other such instrument. Mr. Hunt also testified that the usual procedure for deflating an automobile tire is to unscrew the valve core; however, this procedure is highly dangerous on a high pressure tire similar to the one which exploded because when the core is unscrewed it can be expelled with tremendous force by the high pressure within the tire. Since a valve extension must be used to extend the valve outside of the split rim, evidence indicated the normal procedure for deflating such a tire is to depress the extension core which in turn depresses the valve core and releases the air. However, Mr. Hunt warned that such a procedure is not infallible because the extension core may not be screwed down tight and would not then depress the valve core. In the latter case, a person would hear no air escape and might therefore conclude that the tire was already deflated.

The court concludes that the procedure for deflating such a tire is

different from that ordinarily used to deflate an ordinary automobile tire, that it is difficult to determine if such a tire is deflated, and that the split rim design permits one to attempt to dismantle the tire without deflating it. These characteristics combined, make such a tire an inherently dangerous product which must be handled with care and skill.

The defendant, the United States of America, knew of the danger inherent in attempting to dismantle such a high pressure tire. In the defendant's manual outlining and prescribing procedures for servicemen to use in dismantling such a tire the following statement is printed:

WARNING:

Do not attempt to remove the valve core until the tire has been completely deflated. Valve cores will be ejected at high velocity if unscrewed before the high pressure has been released.
* * *

WARNING:

Before any attempt is made to break the tire beads loose from the wheel flange, verify that the tire has been completely deflated and that the valve core has been removed. If the valve stem is equipped with a valve extension, remove the extension and make sure that the second valve core has also been removed. Never attempt to remove wheel bolts or break beads loose until this check has been made. A tire not completely deflated is as dangerous as an armed bomb.

NAVWEPS 04-10-505, § V., p. 5-2

The defendant also issued to its Air Force personnel the pamphlet, Air Force T.O. T-1-3, § VI, p 6-Z.

WARNING:

Serious injury or death to personnel can result if any part of the dismounting operation is attempted prior to complete deflation of the tire
* * *

Plaintiff's expert witness, Thomas Stone, who had served in the United States Air Force as an aircraft mechan-ic from 1963 to 1967 testified that he received an entire week of training from the United States Air Force devoted to mantling and dismantling high pressure airplane tires. He further testified that he was warned in the school that such a tire, if not deflated, is as dangerous as a bomb. He was instructed to puncture the tire if there is any doubt as to whether it is deflated. Warning signs are also displayed in the shops where such tires are dismantled by the Air Force.

■ The defendant was aware of the inherent danger involved in dismantling high pressure tires. As shown by the evidence the defendant went to great lengths to train and warn its own personnel in order to avoid accidents resulting from the dismantling procedure. The only logical conclusion is that the defendant could actually foresee the possibility that men might attempt to dismantle such a high pressure tire without realizing the tire was not deflated. Yet the defendant sold such tires in an inflated state to the general public without restriction as to the purchaser or any warning or instruction whatsoever to place the purchaser on notice or inform him, of the danger involved in dismantling such a tire. The court finds that the defendant was negligent in its failure to convey any instruction or warning whatsoever to purchasers of inflated surplus tires.

Although Mr. Elkins and Mr. Williams received no warning from the defendant, the evidence supports the conclusion that Mr. Elkins and Mr. Williams were nevertheless aware of the danger involved in dismantling a high pressure tire. The defendant presented evidence to indicate that Mr. Elkins had had extensive experience in dismantling various types of tires although there is no showing that such experience included airplane tires with the split rim design. Regardless of such prior experience, the evidence is uncontradicted that just prior to the accident Mr. Williams and Mr. Elkins together dismantled

more than twenty-five tires for Mr. Ferguson, including at least one or two high pressure tires similar to the one which exploded. In fact the two men had refused to dismantle one such 56″ x 16″ tire because they could not ascertain for certain whether the tire was deflated. This act shows that both Mr. Williams and Mr. Elkins were aware of the danger involved in attempting to dismantle an inflated high pressure tire and further indicates that they realized it is difficult to determine if such a tire is deflated. Furthermore, Mr. Williams testified in the deposition filed in this action that he realized the tires would explode if not deflated before attempting to dismantle them. Although Mr. Elkins and Mr. Williams realized the danger involved in dismantling an inflated tire they did not take sufficient precautions to insure that the tire in question was deflated prior to their attempt to dismantle it. Mr. Williams extracted the valve extension core and erroneously assumed it to be the valve core even though the valve extension core was much longer than any valve core he had ever seen. Even though he heard no air escape, he made no further investigation to insure that the tire was deflated. Mr. Williams testified that neither he or Mr. Elkins tried to puncture the tire or strike it with a hammer or other suitable object to insure that it was deflated. The evidence indicates that Mr. Williams harbored some doubt as to whether the tire was deflated because he asked Mr. Elkins, "Do you think it's all right to work on it?" Mr. Elkins replied that it was all right. Mr. Elkins and Mr. Williams then began to dismantle the tire together, disregarding the following dangerous circumstances: the core extracted by Mr. Williams was unlike any he had ever seen; no air was heard to escape when the core was extracted; the tire was so large it was difficult to determine if it was truly deflated; unlike an ordinary tire, the split rim design could be dismantled without deflating the tire; and the fact that after two or three of the bolts were extracted the

pressure of the tire must have exerted an increased strain on the rim and the remaining bolts, making it increasingly difficult to unscrew the bolts.

The Statement of Torts (1934 Ed.) contains the following statement at p. 1043:

The person using the chattel may disable himself from bringing an action either by his contributory negligence in voluntarily using the chattel with knowledge of its dangerous condition or by his contributory negligence in failing to make a proper inspection which would have disclosed the defect or in failing to use the precautions obviously necessary to the safe use of the chattel.

■■ One having a choice of methods but chooses the dangerous one is ordinarily negligent. 38 Am.Jur. Negligence § 193 (1941). As evidenced by the action of Mr. Williams and Mr. Elkins on the previous day when they placed one of the 56″ x 16″ tires aside without dismantling it due to their uncertainty as to its possible inflation, each man knew of the danger involved in dismantling the tire without being sure the tire was deflated. Nevertheless, each chose to proceed with the dismantling process without using any proper procedure to insure that the tire was in fact deflated. Having actual knowledge of the danger, Mr. Elkins and Mr. Williams had the choice of whether to puncture the tire and insure it was deflated or whether to take a chance and dismantle the tire without further precautions. They chose to accept the risk and proceed without further precautions. They took the risk and lost; they cannot now be allowed to recover from the defendant for the resulting damages. The defendant has carried the burden of proving that Mr. Williams and Mr. Elkins were each contributorily negligent.

For the reasons stated and upon mature consideration of the facts, the court finds that although the defendant was negligent in failing to properly warn or inform of the danger inherent in at-

tempting to dismantle the high pressure tires sold by the defendant, it is clearly proper by a preponderance of the evidence that Mr. Elkins and Mr. Williams were, nevertheless, cognizant of such inherent danger and chose of their own volition to dismantle the high pressure tire without adequate safety procedures. Consequently, they were guilty of negligence which was an efficient and contributing proximate cause of their injuries; therefore, it is adjudged and ordered that the defendant, the United States of America, is not liable for any damages suffered by the plaintiffs as a consequence of the tire explosion, and it is further adjudged and ordered that each party to this action shall bear his or its own costs.