Betty GALANOS, as Personal Representative of the Estate of Tina Marie Kelly, Deceased and Matt Myslakowski, individually and as Next Friend of Marie Myslakowski, a minor, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 81–74236, 81–74235.

United States District Court, E.D. Michigan, S.D.

April 29, 1985.

Gary E. Berger, Allen Miller, Detroit, Mich., for plaintiffs.

Ellen Ritteman, Gary Maveal, Asst. U.S. Attys., Detroit, Mich., for defendant.

## MEMORANDUM OPINION

JULIAN ABELE COOK, Jr., District Judge.

### I.

On November 16, 1981, Plaintiff, Matt Myslakowski [Myslakowski], filed a Complaint, in his individual capacity and as a

next friend of Marie Myslakowski, against the Defendant, the United States of America [Government]. (That case was assigned to this Court). On the same day, Plaintiff, Betty Galanos [Galanos], filed a Complaint against the Government as personal representative of the Estate of Tina Marie Kelly. While the latter case was initially assigned to another judge, it was subsequently reassigned to this Court and consolidated with the former case because of the common issues of law and fact that were presented in the two causes of action. A trial on the merits was held, without a jury, from February 1, 1985 to February 11, 1985.

At the close of evidence, the Court took the matter under advisement.

## II.

These actions are brought under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346 *et seq.* While there is a question raised by the Government as to the applicability of this Act to the instant cause, should Plaintiffs' claim that the Government has waived its immunity as to this action prove to be correct, jurisdiction would be conferred upon this Court by 28 U.S.C. § 1331. This section grants district courts original jurisdiction over all civil actions arising, *inter alia,* under the laws of the United States.

## III.

This cause of action arose out of a motor vehicle accident which occurred on October 13, 1979. As a result of that accident, Tina Marie Kelly, died. Marie Myslakowski, who was also in the accident, suffered critical injuries. Plaintiffs seek damages from the Government for the losses which they have suffered by reason of the death of Tina Marie Kelly and for the injuries that were sustained by Marie Myslakowski. Plaintiffs assert that the Government, through the United States Postal Service [Postal Service], was negligent in its sale of the vehicle in which Tina Marie Kelly and Marie Myslakowski were passengers. Specifically, Plaintiffs claim that the Government was negligent in (1) selling the ve-

hicle in question to the public, (2) failing to convey proper warnings and/or instructions to subsequent purchasers of the vehicle, and (3) designing the vehicle with a low rollover resistance. The Government argues, in opposition, that it is immune from suits of this nature which purportedly involve a "discretionary function." Furthermore, the Government urges that Plaintiffs' claim of negligent design is without merit because the Government did not design the vehicle. The Government asserts that, if this Court finds the discretionary function exception to be inapplicable, (1) it breached no duty to Plaintiffs, and (2) its negligence, if any, was not the proximate cause of the claimed injuries.

## IV.

On the evening of October 13, 1979, four young women were driving south on Ryan Road near the intersection of Hamlin Road in Shelby Township, Michigan. The driver, Renee Pace [Pace], had the permission of her father, the owner, to use the DJ–5A "Jeep" vehicle in which the four rode that evening. The two passengers, who are the subject of this case, were seated in the back of the vehicle that night. The evidence shows that the girls were coming from a nearby Yates Cider Mill where they had been for approximately three hours. Over the course of this time, Pace consumed two beers. There is no evidence, however, to support a conclusion that she was intoxicated to the point where it could be said that her state was the proximate cause of the accident.

The evidence further shows that the Pace vehicle was going between thirty-five and forty-five miles per hour in the southbound lane of Ryan Road, and that it was moving generally at the same speed as the other traffic in that area. Shortly before the accident, however, the Pace vehicle traversed slightly to the right onto the shoulder of the road. No evidence tends to explain the vehicle's diversion except that Pace testified that she lost control of the jeep and did not know why. In an attempt to get the vehicle back on the road, Pace

turned the steering wheel left, and, thereby, caused the vehicle to enter the northbound lane of Ryan Road. She attempted to reverse the direction of the vehicle in an effort to get it out of the lane of the oncoming northbound traffic. However, before this manuever had been completed, and while the jeep was still partially in the northbound lane, it impacted with a vehicle which was being driven by William Bell [Bell] in a northerly direction on Ryan Road. After the impact, the jeep spun into the air over the Bell car and, after apparently several rotations, landed on its top in the southbound lane of Ryan Road, south of the point of impact.

Three of the girls, including Tina Marie Kelly and Marie Myslakowski, were thrown onto the ground as a result of the impact. Tina Marie Kelly and Marie Myslakowski were farthest from the point of impact, laying on the western shoulder of the road. Pace, originally pinned in the vehicle, was helped out soon after the accident.

There was some evidence by two of the witnesses to the accident, George Steadman [Steadman] and Joseph Rentz, both of whom were in the Bell car, that they saw people throwing beer cans from the jeep after the accident. However, this Court attaches no significance to this testimony for two reasons. First, despite the fact that several other witnesses and police investigators testified as to the post-accident occurrences, none of them corroborated this story. Secondly, even if beer cans had been thrown from the car, there is absolutely no evidence that the contents of these cans had been consumed by Pace in close proximity to the accident. In fact, Steadman denied having smelled beer on the breath of any of the girls, even though he came in close contact with them immediately after the accident in the process of giving aid and comfort to them. Thus, this Court confirms its earlier stated finding that there is no evidence which establishes that Pace was so affected by alcohol that her condition, if altered, was the cause, or a contributing factor to, the accident. Similarly, there is no evidence that Pace's oper-ation of the jeep was so negligent as to be the sole cause of the accident.

Marie Myslakowski was hospitalized shortly after the accident and remained in hospitals for the next two and one half months. Tina Marie Kelly was pronounced dead at 10:00 p.m. on the night of the accident within an hour of its occurrence. However, it appears that death was not simultaneous with the accident as several witnesses attested to her being alive immediately after the collision.

## V.

The vehicle in which the girls were riding on the night of the tragic accident was a Jeep Dispatcher 100, Model DJ–5A. It was manufactured for the Postal Service by Kaiser Jeep Corporation and delivered to the Postal Service in 1969. The Postal Service used the jeep for mail delivery from this time until the vehicle was designated as surplus and, then, sold in 1975.

The vehicle involved in the case at bar was sold as a part of the Postal Service's general scheme of selling surplus items in order to promote efficiency and recoup some of its investment in these vehicles that had been replaced by newer models. The vehicles were sold to the general public on an "as is, where is" basis. However, the buyers were given the maintenance records on the vehicles. Also, Dennis Tepner [Tepner], the Postal Service employee who sold the jeep involved in the case at bar, warned potential purchasers to check the vehicle before buying it for bad tires, leaks, etc. Moreover, there was a decal on the dashboard of the jeeps which warned drivers to look before backing up. Finally, Tepner testified that he further warned buyers to drop back more when passing to assure visibility of oncoming traffic since the driver's seat was on the right of the vehicle. However, he gave no other warnings regarding the vehicle. In fact, he was not required to do so by the Postal Service.

The jeep was sold with only one seat (to wit, the driver's right hand seat). There was a metal tray on the left hand side of the vehicle which was used by the letter

carriers to sort their mail for delivery. The front side doors slid open, and the only direct entrance to the back was through the two outward opening doors on the rear of the vehicle. The entire front and back of the vehicle were enclosed under the cab of the jeep.

Tepner promoted the sale of the jeeps through advertisements in newspapers, announcements sent to interested persons who were on the Postal Service mailing list, and by putting a "for sale" sign on a jeep stationed in front of the place where they were sold. The purchaser of the jeep involved in the present case from the Postal Service was John Greenway [Greenway] who bought it from the Postal Service in Flint, Michigan. Tepner does not recall if he gave Greenway an operator's manual or if there was one in the jeep when it was sold, although he stated that, generally, purchasers were given one. There was no testimony as to the purpose for which Greenway bought the jeep.

Greenway subsequently sold the jeep to Peter Plummer [Plummer], who primarily used the jeep for hunting. Plummer, in turn, sold the jeep to Robert Pace, father of Renee Pace, in August of 1979, just two months before the accident involving the Plaintiffs. Robert Pace used the jeep for many purposes, including his use of the vehicle as a general passenger car for family errands. Between the time that the jeep left the Postal Service and the time of the accident, the mail sorting tray had been removed from the front left of the jeep and a seat had been installed on the left front side. Also, much of the floor of the jeep and the dashboard had been carpeted. No seats were in the back, although two tire humps accommodated the two girls in the rear on the night of the fatal crash.

## VI.

■ The record allows the Court to readily reject the Plaintiffs' claims of negligent design. There was a failure by Plaintiffs to demonstrate, by a preponderance of the evidence, that the Government was responsible for the design of the jeep. While Plaintiffs' expert witness, John Noettle, testified that the Postal Service controlled the position of the workshelf and the height of the door, this Court cannot conclude that control of these facts gave the Postal Service a significantly relevant design role in the design of the jeep.

Rather, the weight of the evidence tends to show that the Postal Service was responsible only for certain procurement type specifications and performance specifications but not design specifications to any significant degree. Procurement specifications were described as a "sort of wish list" of characteristics which were not necessarily related to the resulting products. The range of specifications, which have been listed as procurement "specs," were intentionally broad so as to encourage competition among the manufacturers who bid for the production contract. Next, performance specifications were issued which state what the Postal Service would like the jeep to be able to do, with no control reserved to the Postal Service as to *how* the desired performance characteristics were to be achieved. In contrast, design specifications state exactly how an object or part is to be made, in such detail that if given to any two manufacturers each would produce the identical part. The only design type specifications that the Postal Service issued to the Kaiser Jeep Corporation were for the location of the slot for a Postal Service poster to be placed on the side of the jeep, the location of the two sorting shelves and the placement of a special mirror.

From only one of these factors (to wit, the weight and location of the work shelf) was there any indication that it had any effect on the characteristic of the jeep of which Plaintiffs complain, i.e., rollover propensity. The Plaintiffs' and the Government's experts testified that the rollover propensity of the jeep was primarily affected by the wheel base, the track width and the height of the center of gravity. While any change in weight, such as the addition of a tray in the jeep, would affect the center of gravity, the sorting tray had been

removed from the vehicle at the time of the accident from which this case arose. Thus, the only relevant design type role that the Postal Service had with respect to this vehicle could not have been a factor in causing the accident.

## VII.

Plaintiffs' two remaining claims (i.e., negligence in selling the jeep and in failing to warn of its rollover propensity) require this Court to undertake a more extensive analysis of the applicable law. First, the Court must determine if the Government's sovereign immunity bars this suit because, if it does, this Court is without subject matter jurisdiction to hear these claims, see *Carlyle v. U.S. Dept. of Army*, 674 F.2d 554 (6th Cir.1982).

■ Generally, the United States and any of its agencies are exempt from suit by its citizens. It can, however, waive its sovereign immunity, with liability being limited to the express extent of the waiver, see *U.S. v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). Through the FTCA, 28 U.S.C. § 1346, the Federal Government did waive its sovereign immunity as to damages for those injuries which result from certain torts that are attributable to, and committed by, a government employee, while acting within the scope of his/her authority. The FTCA, 28 U.S.C. § 1346(b), authorizes suits against the United States or its agencies:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Section 2680 of this Act sets forth the exceptions to this waiver of immunity. The Government contends that the following exception, which is found in this paragraph, is applicable:

> (a) any claim based upon an act or omission of an employee of the government, exercising due care in the execution of a statute or regulation, whether or not such statute or regulation be valid or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Much has been written as to what constitutes a discretionary function, as opposed to its antithesis of an operational function. However, the nature of "discretion" is such that it precludes a precise definition that would give meaningful guidance in each and every case. As noted in *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) et al*, —— U.S. ——, at ——, 104 S.Ct. 2755 at 2765, 81 L.Ed.2d 660 (1984) "... it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception." Nonetheless, a purview of some characteristic cases provide general guideposts as to the nature of the term.

The starting point of such an overview must necessarily be *Dalehite v. U.S.*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). This landmark case was the Supreme Court's first opportunity to interpret the FTCA. *Dalehite* involved a claim of negligence "on the part of the entire body of federal officials and employees involved in a production of the material—Fertilizer Grade Ammonium Nitrate [FGAN]—in which the original fire occurred and which exploded." This fertilizer was shipped by the United States Government overseas to help feed occupants of Germany, Japan and Korea who had been left with inadequate food sources due to the post-World War II hostilities. The fertilizer was provided, in part, in order to mitigate the danger of internal unrest overseas. Following a cabinet level decision to manufacture and export the FGAN to various Asian and European countries, a program was set in place by the United States Government officials whereby private companies, who operated

the plants where FGAN was produced, were subject to the general supervision of one or more Government personnel.

The particular FGAN in question had been stored in warehouses at Texas City, Texas for a period of three weeks. Then, on April 15, 1947, the FGAN was loaded onto two ships for export, one of which also contained a substantial cargo of explosives. Unfortunately, the FGAN contained nitrate—long used as a component in explosives which ignited on contact with the explosive cargo. By the time that smoke was noticed on the ship, all efforts to stop the fire were unavailing. Both of the ships with the FGAN on them exploded, much of Texas City was leveled, and numerous deaths ensued. Victims and their families sued the Government on the basis of its participation in the program to manufacture and export the FGAN.

In *Dalehite*, as in the instant case, the Government asserted that its role in the FGAN program, for which Plaintiff sought to hold it liable, came within the scope of a "discretionary function." In deciding this issue, the Supreme Court reviewed the legislative history of the FTCA. This history reveals that the discretionary function exception was intended to ensure that the constitutionality of legislation, the legality of regulations and the propriety of a discretionary administrative act would not be tested through tort suits. The Supreme Court noted that "... Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions," *Dalehite* at 32, 73 S.Ct. at 966.

The *Dalehite* Court, while finding that discretionary functions include determinations regarding the initiation of programs, as well as decisions that establish plans and specifications of operations for this program, found that for these determinations to be considered discretionary, they must involve policy judgments, *id.* at 35–36, 73 S.Ct. at 967–968. Thus, on the basis of their review of the intent of the drafters of the FTCA, the Supreme Court determined that the decision to institute the

FGAN program, as well as the decision regarding precautions to be taken in the course of manufacturing and exporting it, were discretionary functions.

In general, the Court found that "the decisions held culpable were all responsibly made at a planning rather than operational level and involved decisions more or less important to the practicability of the Government's fertilizer program," *id.* at 42, 73 S.Ct. at 971.

Similar to the failure to warn claim of Plaintiffs in the case at bar, there was an argument by Plaintiffs in *Dalehite* that the label on the bags of FGAN gave insufficient notice to the ship's personnel of the contents of the fertilizer. However, the Court rejected this argument, finding that the act of labeling the bags of FGAN was also discretionary. Yet, this finding is not dispositive of the issue of the failure to warn which has been presented in the instant case because the labeling involved in the FGAN program was specifically dictated by Interstate Commerce Commission regulation, *id.* at 42, 73 S.Ct. at 971. These regulations gave details on how the FGAN was to be labeled and no further information was required to be on the label. Indeed, the Court found that any variance on the label "was probably forbidden," *id.* Thus, the Court noted that this regulated act was exempt from the waiver of sovereign immunity because of the portion of 28 U.S.C. § 2680(a) which excepts "an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation ..." from liability under the Act.

Finally, it is relevant to note that the *Dalehite* Court rejected any notion of the Act extending to absolute or strict liability. The FTCA, the Court noted, "is to be invoked only on a negligent or wrongful act or omission of an employee," *id.* at 44, 73 S.Ct. at 972. This may be relevant to the instant case since one possible reading of Plaintiffs' claims is that the Government's role in the design and sale of the jeep subjects it to strict liability for any injuries caused by the jeep. Such a claim

by the Plaintiffs in the instant case must be rejected, as were similar claims by the Plaintiffs in *Dalehite*, for being outside the parameters of the FTCA.

Like *Dalehite*, the Sixth Circuit case of *Downs v. U.S.*, 522 F.2d 990 (6th Cir.1975), presents a broad overview of the discretionary function exception and its applicability to certain governmental acts. In *Downs*, the Court found the Government to be liable for the acts of the Federal Bureau of Investigation [FBI] agents which resulted in the death of victims of a hijacking. A hijacker, seeking to fly to the Bahamas from Tennessee, landed the hijacked plane for a refueling stop in Jacksonville, Florida. There, despite warnings from the pilot that any Government intervention would likely precipitate hostility on the part of the armed hijacker, the FBI attempted to use rifles to secure the plane. As a result, the hijacker was provoked to kill himself, his wife and the pilot.

Referring to the discretionary function exception, the *Downs* Court noted that while the FBI agents, who were involved in that case were called upon to exercise judgment

> ... Judgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees.... Driving an automobile involves judgment.... Yet the automobile accident caused by a federal employee while on the job is the archetypal claim which Congress sought to place in the Courts. If exercise of judgment were the standard for applying the discretionary function exception, a host of cases would have been wrongly decided. *Id.* at 995.

Rather, the Court went on to state that the "discretionary function exception immunizes the Government employees while they are formulating policy," *id.* at 996, and noted that the legislative history of the Act, as well as *Dalehite, supra*, supported such a finding. Moreover, *Downs* found that cases, which seek to define the distinction between discretionary and operational

functions by looking at the status of the official who makes the judgment, do not offer a sufficient test for determining whether the actions of a Government employee are outside the scope of the FTCA. The *Downs* Court chose to adopt a less superficial test, noting:

> We believe that the basic question concerning the exception is whether the judgments of a Government employee are of "the nature and quality" which Congress intended to put beyond judicial review.... Congress intended "discretionary functions" to encompass those activities which entail the formulation of governmental policy, whatever the rank of those so engaged. *Id.* at 997.

Applying these considerations to the facts before it, the Sixth Circuit concluded that the acts of the FBI in that particular hijacking situation were not the type which the legislature intended be included in the discretionary function exception. The Court found that no policy type decisions dictated the type of judgments which were involved in that case and that there was no evidence that the governmental function being performed would be unduly inhibited by the threat of tort liability if the immunity was not granted.

Similarly, this Circuit in *Reminga v. U.S.*, 631 F.2d 449 (6th Cir.1980) confirmed that discretionary functions are defined by the nature of the decision involved. This opinion, which cited *Downs, supra*, with approval, involved a small aircraft which crashed after running into a wire from a television tower that was not shown on a Federal Aviation Association [FAA] map and whose placement was approved by the FAA. The Court found that where the distinction between operational and discretionary functions is not clear, the distinction must turn on the extent to which policy is involved in the decisioning. *Reminga* quoted the following passage from *Griffin v. U.S.*, 500 F.2d 1059 (3rd Cir.1978) where the Government was held liable for injuries which had been caused by a vaccine that its doctor had prescribed:

The Court emphasized that the only thing challenged was the way in which a regulation was implemented. While implementation involved the exercise of judgment, it was the judgment of a professional measuring of particular medical offset of laboratory activities, "not that of a policy-maker promulgating regulations by balancing competing policy considerations in determining the public interest."

While the *Reminga* Court held that the FAA's decision to authorize the placement of the tower was a discretionary function, this holding was based on the finding that the FAA had sufficiently demonstrated that it considered competing demands and made its decision on policy bases within the range of discretion which the applicable regulations had specifically granted to it.

See also *Miller v. U.S.*, 583 F.2d 857 (6th Cir.1978) where the Court held that the discretionary function exception does not immunize the Government from liability for the manner in which its agents operated the flood gates at Sault Ste. Marie, although it did insulate the Government from tort liability for "*deliberate* official decisions and directives" regarding the levels at which the lake would be maintained, *id.* at 867 (emphasis added). As noted in the district court on remand, *Miller v. U.S.*, 480 F.Supp. 612 (E.D.Mich.1979), "the discretionary function exception to liability under the FTCA does not insulate the government from liability for all mistakes of judgment, but only for significant policy and political decisions...."

The Government, in the instant case, seeks to inject an alternative standard by which to draw the distinction between discretionary and operational functions. In furtherance of this position, the Government cites *Barton v. U.S.*, 609 F.2d 977 (10th Cir.1979) which states as follows:

The rule is that if a government official in performing his statutory duties *must* act without reliance upon a fixed *or readily ascertainable standard*, the decision he makes is discretionary and within the exception of the Tort Claims Act. (emphasis added)

In that case, the Government was sued by ranchers who were adversely affected by the Bureau of Land Management's [BLM] decision to revoke their cattle grazing rights. The BLM decision was based on its belief that, due to drought, overgrazing would subject the land in question to permanent damage. However, the affected ranchers "disagreed with the decision, claiming that the feed on the allotment was adequate to support the designated number of livestock on the land without substantial injury," *id.* at 979. However, the Court gave no indication of any research or expert opinion that would indicate that the ranchers' opinion was based on any standard other than their own self interest. Moreover, the *Barton* opinion indicates that the Government's decision was based on a consideration of factors that would affect the Government's ability to preserve and protect the land for public grazing. After considering the factors which affect the policy in favor of such protection, the Court concluded that the Government had made a deliberate policy decision.

Here, the Government also seeks support for its position in two FTCA cases which involve Government decisions to limit its role in safety inspection by delegating that duty to private parties. In *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) et al,* — U.S. —, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), one hundred twenty four passengers were killed when an airplane crashed after fire broke out in the cabin. The FAA had issued documents which certified that the plane conformed with minimum safety standards. Thus, the Plaintiffs alleged that the FAA had been negligent in its certification of the airplane since the fire would not have occurred but for the substandard conditions on it. However, the FAA responded that it had properly certified the airplane on the basis of the documentation which had been presented by the owner. Under the statutory and regulatory scheme, the FAA merely "spotchecked" the airplanes and

left the inspection of details up to the owners to obtain.

While the Plaintiffs argued that the FAA should have fully inspected the airplanes, the FAA replied that such a detailed inspection by it would not be feasible due to the limitations of time and funding. The Court found that the FAA's decision to put the burden of compliance with FAA regulations up to the owners was discretionary because, in making this decision, it had considered the feasibility of the program and how to "best accommodate the good of air transportation safety and the reality of finite agency resources."

In reaching this conclusion, the Court specifically found that whether the discretionary function exception applies depends on "the nature of the conduct, rather than the status of the actor," id. at ——, 104 S.Ct. at 2765. Thus, the Supreme Court stated:

> ... the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

Moreover, the Court noted that the Congressional intent in enacting the discretionary function exception was "to prevent judicial second-guessing of legislative and administrative decisions grounded in *social, economic* and *political* policy through the medium of an action in tort." (emphasis added)

The Court found that the Congress specifically intended that the FAA share the safety inspection rule with the public. The Congress and the agency had considered that, with fewer than four hundred engineers, the FAA could not possibly complete an elaborate compliance review process alone. Thus, the FAA was authorized by 49 U.S.C. § 1355 to delegate certain inspection responsibilities to qualified private persons. Since the Government considered the competing economic and social needs, and acted with specific regulatory and statutory authority, the Court found that the

FAA decision to delegate certain inspection tasks was discretionary.

Similarly, in *Feyers v. U.S.*, 749 F.2d 1222 (6th Cir., 1984), Plaintiff claimed negligent inspection and failure to provide safety training by the Government in the railyard where he worked and was injured. Plaintiff was employed by Chrysler Corporation [Chrysler] who operated the Detroit Arsenal Tank Plant which was owned by the United States Government.

The Government had contracted with the private employer to have Chrysler bear the responsibility for maintaining a safety program at the plant, with the Government only to make periodic spot reviews. The Court found that the Government made this decision on the basis of (1) Chrysler's competency in management of safety programs, (2) the limited access to the plant by Governmental inspectors due to Chrysler's need for security, (3) the Government's inability or reluctance to intervene in Chrysler's standard safety practices, and (4) a study of safety statistics at the plant. Thus, the Court concluded that this decision, as the decision in *Varig*, entailed policy considerations, id. at p. 365. Consequently, it concluded that the decision to delegate the safety inspection duties to Chrysler was a discretionary function.

In addition to these cases (where the Government had deliberately, and with consideration of political, economic and/or social factors, decided not to bear certain responsibilities), there is another line of cases which hold that where the Government does bear the responsibility of a particular task, it is liable for the failure to perform that task free of negligence. In *Indian Towing Co. v. U.S.*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court considered the liability of the United States Coast Guard [Coast Guard] for the grounding of a boat which was precipated by a failure of the light at the Coast Guard operated lighthouse. The Court found the Government liable, pursuant to the FTCA holding, as the Government conceded, that the discretionary function exception did not apply. The Court held that "... it is horn-

book tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his "good samaritan" task in a careful manner," *id.* at 64–65, 76 S.Ct. at 124. Moreover, the Court held, at 69, that:

The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order....

A like holding was rendered by the Tenth Circuit in *Smith v. U.S.*, 546 F.2d 872 (10th Cir.1976). There, a young boy was severely burned when he wandered into a superheated thermal pool in Yellowstone Park. While the Government had put up warning signs in several areas of the park, the area where the Plaintiff was injured, although open to the public, was devoid of such signs. The Government argued that its decision not to place warning signs there was based on a "policy decision" to leave that area developed so as to conserve the scenery.

While the Court and the Plaintiff conceded that the decision to leave some areas of the park developed was a discretionary function, the Court concluded that the decision not to warn of the dangers of the thermal pools was a separate act, which was not within the ambit of a § 2680 exception. The Court reasoned:

A policy decision to designate certain areas as "developed" ones may reasonably entail the omission of boardwalks, trails or footpaths and signs marking such ways. However, it does not follow that the Government, as a land owner, is absolved of all duty under state law to erect safety devices or signs cautioning about conditions which have been left undisturbed as a policy matter.

Several other Courts have held, in conformity with these above-cited cases, that while policy may determine the decision to carry out a discretionary function, decisions as to the *manner* in which that function is carried out, if not also dictated by policy, are not discretionary functions. See, e.g., *White v. U.S.*, 317 F.2d 13 (4th Cir.1963) where the Court of Appeals for the Fourth Circuit rejected the Government's contention that the doctor's decision as to the degree of freedom allowed a particular mentally ill Veterans Administration [VA] Hospital patient, who died while out on privileged status, was discretionary. The Court found that "... while the policy embodied in the VA regulations that patients should be allowed the maximum freedom warranted by their condition is a discretionary decision, the application of that policy to the individual case is an administrative decision at the operational level which if done negligently will make the Government liable...." See also *Hernandez v. U.S.*, 112 F.Supp. 369 (D.Hawaii 1953).

Similarly, in *Somerset Seafood Co. v. U.S.*, 193 F.2d 631 (4th Cir.1951), the Court held that once a Government decision had been made to provide for boat traffic safety around a wrecked ship, that function must be carried out free of negligence. The Court stated that "there is certainly no discretion to mark a wreck in such a way as to constitute a trap for the ignorant or unwary rather than a warning of danger." See also *Reminga, supra*, 631 F.2d at 452 where the Court held that the decision of the FAA to designate the location of aerial towers on its maps, while not a required FAA function, once undertaken, must be carried out without negligence. Also supportive of this position is *Akra Shipping Co. v. U.S.*, 363 F.Supp. 1220 (D.S.C.1973) "there are numerous cases which hold that, once the Government has exercised its discretion and has decided to proceed in a matter, the Government is liable for negligent acts done in the course of such proceedings," at 1221.

The Government again seeks to assert a contrary rule of law by citing *Stewart v. U.S.*, 486 F.Supp. 178 (C.D.Ill.1980). There, Plaintiff claimed that her diseased husband had been killed by asbestosis, a pulmonary lung disease which he contract-

ed during his work with old asbestos that had been sold to his employer from the Government's national stockpiles of asbestos. Plaintiff claimed, *inter alia,* that the Government was negligent in selling the asbestos without proper warnings. While the Court held that the Government's actions with regard to this sale were discretionary functions, several aspects of this case deserve consideration. First, that case held, in conformity with above cited law, that the decision to sell, although discretionary, must be considered as separate from the decision not to warn. Also, the Court confirmed that only if the decision to sell the asbestos without warnings was "a decision necessitating the weighing of *policy* considerations," *id.* at 183, was the Government's decision protected from liability by § 2680(a) of the FTCA.

Finally, the Court decided that the no-warning decision was protected because it involved policy decisions. Specifically, the Court found that the Government had considered (1) the cost of its examination of the asbestos after the long storage period and determined that it was too great, and (2) the fact that the buyers were all knowledgeable members of the relevant industry that had the ability to determine the condition of the asbestos for themselves.

The last line of cases which this Court has reviewed in determining the applicability of discretionary function exception are the cases that specifically considered the issue of the Government's liability to persons who were injured in an accident involving the alleged rollover of a used postal jeep. See *Ford v. U.S.,* No. 81–1922 (S.D.Tex., January 24, 1984); *Shirey v. U.S.,* 582 F.Supp. 1251 (D.S.C.1984); and *Key v. U.S.,* No. 83–168 (E.D.Ark., April 30, 1984). All these cases—to the extent that they find the Postal Service's failure to warn to be a discretionary function—are distinguishable from the instant case. In none of these cases was there any indication that the jeep was being used as a passenger jeep, as in the instant case. Thus, there was no claim based on failure to warn *against the use of the jeep as a passenger vehicle,* which Plaintiffs, in the instant case, make.

■ First, this Court concludes that these cases dictate a finding that the Government's decision to sell the jeeps to the public was clearly a policy based discretionary function which is specifically within the purview of the execution of a statute and regulation (39 U.S.C. § 401(5) and 39 C.F.R. § 211.2, along with, e.g., Government's exhibits H, I and L). The evidence before this Court indicates that, in making that decision, the Government considered the economic need to operate efficiently by recouping some of its expenditures through the sale of surplus goods (see, e.g., deposition of Donald C. Crane, then Director of Office of Fleet Management and the person who oversaw the Postal Service's sale of jeeps). If the threat of tort liability hung over the Government for the mere decision to sell such surplus goods, it would improperly impede a Government function and, thus, put the Courts in the position of interfering with policy decisions which have been properly reserved to another branch.

Further, to the extent that the Plaintiff claims the Government to be liable for the sale of the jeep under a theory of *strict liability,* this theory must be rejected as outside the purview of the FTCA. See *McKay v. U.S.,* 703 F.2d 464 (10th Cir. 1983). See also *Kueppers v. Chrysler Corp.,* 108 Mich.App. 192, 310 N.W.2d 327 (1981), stating the Michigan Rule that "reliance on an implied warranty theory of recovery was precluded where the goods were purchased 'as is,'" at 210, 310 N.W.2d 327.

■ However, as the foregoing authorities indicate, the decision as to the *manner* of the sale of these jeeps is a separate matter. This Court must consider whether the Government, having properly exercised its discretion to put the jeeps up for sale, made decisions as to the manner of sale on the basis of policy type considerations. The evidence indicates that it did not. Specifically, this Court finds that the decision not to warn subsequent purchasers that

the jeep, if used as a passenger vehicle, had a dangerous risk of rollover was not the exercise of a discretionary function. In making this finding, this Court has concluded that (1) the Government made no policy-type decision not to give such warning and (2) there was readily ascertainable data available to indicate that such a danger existed. This Court will initially address this second finding.

The Government acknowledges that, at or before the sale to the public of the jeep involved in this case, it had possession and knowledge of the Cornell Aeronautical Laboratory, Inc.'s "Test and Evaluation of a ¼ Ton Light Delivery Vehicle," dated July 1971 [Cornell Report]. See Government's Responses to Plaintiffs' Request for Admission filed April 21, 1983 and May 27, 1983 (Plaintiffs' exhibits 26 and 27, respectively). Moreover, the Government admits that this Report includes the results and summary of tests of a 1969 DJ5A (the same type vehicle as the one involved in the case at bar). Further, the Government admits that the Report contains, *inter alia*, the following conclusions:

6. Compared with most passenger automobiles, the test vehicle had a very high value of center of gravity height to wheel track ration [a factor of two difference] and thus tends to reduce its rollover immunity....

7. The difference between the maximum lateral acceleration on dry surfaces (about .65g ) and the equivalent lateral acceleration for rollover based on the static tests (about .75 g) is a measure of the operating safety margin of the vehicle. This difference is small by modern passenger car standards and is judged to be a potential safety problem with this vehicle. (Emphasis added)

In general, it was found that the test vehicle's performance characteristics in the normal range of operation were satisfactory but that, near the limit of performance (particularly at full rated load), its performance does not compare favorably with passenger vehicles.

This Court has reviewed this Report in its entirety because the Government contends that these findings must be read in context. While these findings indicate that the jeep should not be used as a passenger vehicle because of the relatively high roll propensity to other passenger vehicles, the Report also included findings that indicate that the use to which the Postal Service intended to put the vehicles, i.e., as a light delivery truck, was a relatively safe one. However, nothing in the Report mitigates the dangers, which have been noted above, of the jeep as a passenger vehicle. Indeed, John Noettle, the expert witness who testified on behalf of the Plaintiffs, stated that the conclusion of the Cornell Report was that the DJ5 should *not* be used as a passenger vehicle.

The Postal Service also indicates its knowledge of this finding through the testimony of Crane who was the Director of the Office of Fleet Management for the Postal Service during the time that the jeep in question was sold. He had read the Cornell Report, and concluded that its findings as to the negative comparison to a passenger vehicle were irrelevant since the Postal Service used the jeeps only as light delivery trucks. He stated that the jeep "wasn't as good as a passenger car, but I felt that the statements of Cornell were satisfactory from *our* standpoint," (emphasis added). Crane Depositions, p. 25. While Crane could properly ignore the negative comparisons of these jeeps to passenger vehicles for purposes of determining their safety for use by postal employees, Crane also had responsibility in 1975 for the Postal Service's program to sell the jeeps to the general public. Yet, there is evidence in his deposition that, in carrying out the latter responsibility, he gave no consideration to the negative comparison of the jeeps to passenger vehicles to determine their safety for use by the general public. This is indicated by the following passage from Crane's deposition, at p. 28:

ATTORNEY: Q. Was there any determination about giving buyers information about the

jeeps driving characteristics, if any?

CRANE: A. No, the buyer was given the opportunity to drive the vehicle and that's all that was given to the driver. We felt that there was no need to make any special effort to explain the vehicle which had been operating satisfactorily for us.

Although the government did not give policy considerations to the data, the evidence supports the finding that there was readily ascertainable data available to the Postal Service to make the danger of the jeep's use as a passenger car known to it. Thus, this case is distinguishable from *Barton, supra,* where no such data was presented by Plaintiffs.

Next, this Court finds that the evidence fails to show that the Government made any discretionary decision not to warn subsequent purchasers of the dangers of use of the jeep as a passenger car. The evidence, indeed, shows that no policy considerations went into this decision at all. There is no indication in the record that the Postal Service even considered this danger when putting the jeep on the market for use by the general public. Rather, they merely appear to have concluded that since *their* use of the jeep was relatively safe, no other consideration need be made. This indicates that the failure to make this warning was not a deliberate decision but rather an act of default which resulted from the short-sighted view given by the Postal Service to the jeep's safety record. This act or omission was, thus, not the nature or quality of decision that could be considered a discretionary function. It involved no consideration of political, economic or social policy. Rather, it occurred in the course of the operational task of detailing the logistics of the sale and, thus, was the mere omission of an operational task. Therefore, it is the *manner* in which the Postal Service implemented its program to sell jeeps in which it is claimed by Plaintiffs to have been negligent.

Moreover, there was no showing by the Government that a requirement to issue this warning would have threatened the feasibility of the Government's discretionary decision to sell the jeeps. There are no rules or regulations (including a consideration of the Postal Service instructions for sale of the jeep as found in Government Exhibits H, I and J) which specify any requirements on how subsequent purchasers are to be warned. Thus, there is no evidence that the limitations on warnings, which were given to purchasers, were the result of the exercise of a statutory or regulatory function, as in cases like *Dalehite, supra.*

Rather, it appears that this case falls within the category of cases such as *Indian Towing, Smith* and *Somerset, supra,* where the Government, having exercised its discretion to perform a function, i.e., sell jeeps, then—on an operational level—failed to carry out that function free of negligence. Thus, the Government is not exempt from liability for that negligence. Moreover, the Government can be said to have improperly induced the public to rely on it to provide all necessary warnings. The purchasers of this jeep were given several types of warnings. The evidence shows that potential purchasers were warned (1) to drop back when passing, (2) about the jeep's maintenance (or lack thereof), (3) to look before backing up, via the decal on the dashboard, (4) to inspect the vehicle for patent defects, such as bad tires, leaks, etc., and (5) to read the operator's manual which is replete with warnings regarding the operation of the vehicle. As the case authority indicates, not even the Government has the discretion to leave a trap for the ignorant or unwary or to ignore their duties under state law. Having concluded that the failure to give purchasers a warning not to use the jeep as a passenger vehicle was not a discretionary function, this Court will now turn to the issue of whether the Government had a duty to give such a warning under the laws of Michigan.

## VIII.

Under Michigan law, a seller of used goods has a duty "to future and foreseeable users of the product to exercise the reasonable care required of a reasonably prudent seller under the existing circumstances," *Johnson v. Purex Corp.*, 128 Mich.App. 736, 341 N.W.2d 198 (1983). This duty includes a duty to "relate information as to the character and condition of the chattel which he [seller] should recognize as necessary to enable the prospective user to realize the danger of using it," *Elkins v. U.S.*, 307 F.Supp. 700 (W.D.Va. 1969). This duty applies to dealers in used goods, see *Blanchard v. Monical Machine Co.*, 84 Mich.App. 279, 269 N.W.2d 564 (1978), as well as to one time sellers of used products, *Bevard v. Ajax Manufacturing Co.*, 473 F.Supp. 35 (E.D.Mich.1979). While this Court has already noted that the "as is" disclaimer may exclude liability under a theory of implied warranty, the designation of the sale as being on an "as is" basis does not relieve the seller of his duty of care, under a theory of negligence, *Blanchard, supra,* 84 Mich.App. at 283, 269 N.W.2d 564.

The question of foreseeability is a question of fact, see *Johnson* and *Blanchard, supra.* See also *Chrite v. U.S.*, 754 F.2d 372 (6th Cir. Court of Appeals, 1984) where the Court noted that Michigan law only requires warnings to readily identifiable targets, or those foreseeably endangered. However, as noted in *Bevard, supra,* at 40, "if we somehow create a zone of risk or danger, then we are obligated, in law, to all those whom we could or should foresee as entering that zone."

This Court notes also that the Government cites *Allison v. U.S.*, 264 F.Supp. 1021 (E.D.Ill.1967), which holds, in relevant part, that the Government is not (1) obligated under the FTCA to warn of obvious dangers, (2) under any duty to warn unless there is some reason to suppose that a warning is necessary, and (3) bound to anticipate or reasonably foresee a danger which has been occasioned by an extraordinary use of the article or the misuse of such article by a careless or incompetent person.

Since the sale of the used Postal Service jeeps is, and was, an ongoing function which involves several thousand vehicles, the Government cannot be said to be like the Defendant in *Bevard,* a one time seller of used goods. However, this program was not the primary function of the Postal Service, so that it may not necessarily be, as the Defendant in *Blanchard,* a dealer of used goods. Nevertheless, the Postal Service undoubtably falls somewhere in between, and as noted in *Bevard,* at 40, "any seller does owe some duty to buyers and those within the foreseeable scope of risk." Thus, this Court concludes that the Postal Service owed a duty to subsequent purchasers of the used Postal Service jeeps which it sold.

The next issue is, then, whether Pace, Tina Marie Kelly and Marie Myslakowski's use of the jeep as a passenger vehicle was a foreseeable one. The Government argues that it was not. In support of this argument, they point to the fact that the vehicle was sold with only one seat and a tray up front and no rear seats. They contend further that it is awkward to enter the rear of the jeep because you have to bend over, implying that its use should have been exclusively for cargo. Moreover, Tepner and other Postal Service witnesses stated that they had never personally observed the jeep being used as a passenger vehicle.

Nonetheless, this Court concludes that such a use was reasonably foreseeable. First, it should be noted that the Government placed no restriction on who could purchase the jeeps. Indeed, the general public, not just persons in delivery businesses, were invited to purchase the vehicle. Second, the operator's manual, which purportedly accompanied all the vehicles on their sale to the public, included no reference to the DJ5A as a "truck," only as a "jeep" or "vehicle." Third, this jeep has characteristics which are not very dissimilar from those of a passenger jeep with which most of the general public is

familiar (pictures of the jeep are included in the operator's manual). While the DJ5A came with only one seat, an unwary user could reasonably assume that this seating arrangement was created only because the Postal Service required only one seat and not because the addition of more occupants was dangerous. Additionally, Crane admitted that he realized the jeeps would likely be put to many uses, including service as a passenger vehicle, see Crane Deposition, p. 45. Moreover, the testimony of William Thomas, General Manager of Delivery and Retail Policy Division of the Postal Service, indicated that the Postal Service sold the jeeps to the public "for any use they wanted." Under these circumstances, the Court concludes that a use of the vehicle as a passenger vehicle should have been foreseen by the Postal Service.

Nor does this Court consider the vehicle to have been so altered as to have made its use on the night of the accident a misuse. The addition of the one seat in the front was, to the unwary person, merely a cosmetic change to accommodate his/her comfort. Similarly, the seating of two persons in the back of the vehicle, like the seating of persons in the back of a station wagon, while possibly a little awkward is not so far afield from the use for which the vehicle appears reasonably suited as to make it a misuse by the unwary user.

■ Now, this Court turns to the standard of care which the Government owed to foreseeable users of its surplus jeeps. The law in this state calls for a general standard of care to be that which a reasonably prudent seller in like circumstances would exercise. This Court believes that a warning, in writing, not to use the vehicle as a passenger vehicle, was required of a reasonably prudent seller under these circumstances. This holding is based on the finding that the Postal Service had knowledge of the danger of rollover (per the Cornell Report, discussed supra), and the reasonable foreseeability of the use of the jeep as a passenger vehicle, which created a need for the Postal Service to warn against such a use. Also, the evidence

tends to show that this danger, while known to the Postal Service via the Cornell Report, was a latent danger, not obvious to the unwitting driver or occupant of such a vehicle. Thus, this Court concludes that, in breach of its duty, the Postal Service negligently failed to warn against the use of the DJ5A jeep as a passenger vehicle.

## IX.

■ The Government argues, nevertheless, that even if its duty to warn Plaintiffs has been breached, this failure was not the proximate cause of the accident. First, the Government posits that Robert Pace, owner of the jeep at the time of the accident, as well as his daughter, Renee, knew of the danger of rollover. Second, the Government urges that the rollover propensity of the jeep was not the cause of the accident which led to the Plaintiffs' losses. This Court finds both of these contentions to be without merit.

While there is conflicting evidence before this Court, it finds that the testimony of Robert Pace on this issue was most credible. Robert Pace stated that he received no warnings from Plummer, who sold him the jeep, as to its rollover propensity. Moreover, Robert Pace denied knowledge through his own observations or any other source of an unusually dangerous rollover propensity of the jeep, which he owned for only two months. Finally, Robert Pace stated that he only warned his daughter to be careful in driving the jeep, the same as he would have warned her when driving any vehicle, and that the steering wheel on the jeep had a "little play" in it. The demeanor and openness of Robert Pace gave credibility to his testimony. Thus, this Court concludes that Plaintiffs have shown, by a preponderance of the evidence, that neither Robert Pace nor his daughter had any warning as to the rollover propensity of the jeep in question.

Similarly, on the issue of proximate cause, this Court believes that Plaintiffs have sustained their burden of proof of establishing that this rollover propensity was the cause of the accident. The testi-

mony of witnesses to the accident is of little assistance on this point because none of them could testify conclusively whether the jeep had, or had not, begun to roll over *before* its impact with the Bell vehicle.

Thus, this Court has looked to the testimony of the two experts, each of whom reconstructed the accident. While the testimony of Wayne T. Van Wagner, expert for Defendants, was to the effect that the impact with Bell's vehicle, and not the rollover propensity of the jeep, caused the accident, this Court is more persuaded by the testimony of John Noettle, Plaintiffs' expert, who testified that the accident was caused by the high rollover propensity of the jeep. Noettle stated his belief that the jeep would have rolled over without the impact with the Bell vehicle. His experience led him to believe impacts do not usually result in the rotations that the jeep went through since the kinetic energies of the two vehicles which impact generally tends to balance each other out. He concluded that, in part, it was the addition of passengers, changing the center of gravity and reducing the rollover immunity, which caused the jeep to roll over. Noettle further opined that it would have been less likely that the occupants would have been ejected had there been no rollover. Noettle's experience and study of this phenomenon has been extensive. Moreover, he visited the scene of the accident, examined the vehicle, studied where the jeep impacted with the Bell vehicle, and how the vehicle landed on the ground. Noettle observed that the two vehicles would not have impacted as they did had not the Pace vehicle been in a roll mode (i.e., beginning to roll over) before the impact. This Court concludes that Noettle's testimony, as well as his knowledge and training in this field, support the Plaintiffs' contention that the rollover propensity of the jeep caused the jeep to react as it did and, thus, caused the ejection and such violent damage to its occupants who are represented by the Plaintiffs in this case. This Court also finds that the Plaintiffs' injuries were proximately caused by the Government's failure to warn them of the rollover danger of the jeep when used as a passenger vehicle.

This Court cannot attach much weight to the Government's final argument that the lack of warning was not the proximate cause of the accident because it would not have been seen by the Pace vehicle in any event. In support of this, the Government argues that since the jeep's dashboard and the warning thereon regarding backing up had been carpeted over, any warning regarding rollover would have been similarly obscured by the carpeting. This argument, however, calls for too much speculation to be given validity. One must assume, first, that the warning could have only been placed on the dashboard, and, secondly, that it would have been given as little significance as the other warning by the owner who allowed the carpeting to be installed. No evidence indicates that such assumptions would be anything but speculative, and, thus, this Court declines to adopt them. Moreover, there is no evidence that Robert and Renee Pace, had they been warned not to use the jeep as a passenger vehicle, would have ignored it.

## X.

 In considering the damages owing to Plaintiffs in this matter, the Court has considered, with respect to Tina Marie Kelly, (1) the pain and suffering which she experienced from the time of the accident until the time of her death shortly thereafter, (2) the grief to her family and (3) the resultant burdens which they bore, and continue to bear from having to cope with that grief. With respect to Marie Myslakowski, this Court has considered her testimony, the testimony of her father, the deposition testimony of her two treating physicians, Drs. Mary Ann Guidice and Bernard Bast. These doctors support the conclusion that Myslakowski has been suffering, and continues to suffer, from a type of brain damage known as closedhead injury, along with several physical injuries which she incurred in the accident. She was hospitalized for approximately two and one half months, and undertook extensive ther-

apy to help her memory and walking. She has improved significantly since October 1979, but continues to suffer from a memory deficit.

On the basis of these damages, the Court awards the Plaintiff, Betty Galanos, as representative of the Estate of Tina Marie Kelly, the sum of $550,000.00, exclusive of costs, interest and attorney fees, and the Plaintiff, Matt Myslakowski, individually and as next friend of Marie Myslakowski, the sum of $350,000.00, exclusive of costs, interest and attorney fees.

In summation, this Court finds the Government liable to the Plaintiffs in the amounts as set forth above for its negligence in causing the losses which Plaintiffs have suffered.

IT IS SO ORDERED.